Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 95 C 7401 | **DATE** | 10/26/2001 |
| **CASE TITLE** | Gerlib vs. R.R. Donnelley & Sons | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Proceedings on Count 1 are stayed through 2/28/02 to permit plaintiffs to exhaust plan remedies regarding their reconstituted claims asserted in that Count. The Court grants Donnelley's motion for summary judgment (149-1) as to Counts 4,5, and that part of Count 2 relating to the claims for separation pay benefits by plaintiffs who elected retirement option 4, but denies the motion in all other respects. Plaintiff's motion for partial summary judgment (153-1) is granted in part and denied in part. Status hearing set to 11/8/01 at 9:30 for the purpose of setting a trial date with regard to Count 3 claims. Trial counsel directed to appear.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | **Document Number** |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | OCT 3 0 2001 | | |
| ✓ | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | | | 218 |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| | | courtroom deputy's initials | FD-1 D FOR DOCKETING 01 OCT 29 PM 4: 14 | date mailed notice | |
| OR | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RONALD GERLIB, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 95 C 7401 |
| | ) | |
| R.R. DONNELLEY & SONS | ) | **DOCKETED** |
| COMPANY, et al., | ) | |
| | ) | OCT 3 0 2001 |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On January 26, 1993, Sears, Roebuck & Co. announced that it was discontinuing its catalog operations. The announcement surely had a ripple effect on Chicago's economy, and this case concerns one of those ripples: the decision two days later by R. R. Donnelley & Sons to close its Chicago Manufacturing Division, the facility responsible for printing Sears' catalog.

The plaintiffs, all former employees at Donnelley's CMD, filed a five-count complaint. We discuss the specifics of each count below, but generally speaking, Counts 1 and 2 allege class claims that Donnelley failed to pay all retirement benefits and separation pay benefits provided under the company's Retirement Benefit Plan and Separation Pay Plan. Count 3 alleges a class claim that Donnelley targeted older employees for termination because of their age in violation of the Age Discrimination in Employment Act. Count 4 alleges a class claim of age discrimination in the payment of benefits; specifically the plaintiffs allege that Donnelley refused to pay separation pay benefits to employees who were 55 or older when Donnelley shut down the CMD. And Count 5, the only individual claim, alleges that Donnelley breached the fiduciary duties it

218

owed to George Nedved, a former employee who retired from the CMD in July 1992, by not disclosing that he may have had the right to enhanced benefits under Donnelley's Retirement Benefit Plan and Separation Pay Plan.

## DISCUSSION

The plaintiffs have moved for summary judgment on all counts except Count 3, and Donnelley has moved for summary judgment on all counts. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c).

**A.    Counts 1 and 2: Class claims under ERISA**

**1.    Donnelley's benefit plans as they existed in 1993-94**

At the time the plaintiffs' employment with Donnelley ended, Donnelley had two ERISA-governed plans in place that are pertinent here. The Retirement Benefit Plan, as it existed at the time of the shutdown, granted retirement benefits to employees "who retire or otherwise terminate their employment on or after the [Plan's] relevant effective date[]." PX 13, Intro. & Art. 3. Normal retirement benefits were provided to employees whose employment terminated after age 65, with benefits based on a number of variables, including age and length of service. Early retirement benefits were provided to employees terminated after reaching age 55 but before age 65, with benefits reduced based on a percentage which depended on the employee's age at the time of termination.

As of the time of the shutdown, Donnelley also offered "separation pay benefits" under its Separation Pay Plan, which stated that its purpose was "to provide separation pay for certain

eligible employees whose termination of employment has been initiated by the Company on account of a reduction in the workforce or discontinuation of the employee's job and not by reason of transfer to an affiliated or successor employer or retirement." PX 16, ¶1.1. Only permanent employees who were "separated from the Company because of a reduction in the work force or discontinuation of the employee's job" were eligible for benefits. *Id.*, ¶2.1. The benefits consisted of a specified number of weeks of pay, determined based on the employee's length of continuous service. It also provided that "[i]n certain permanent workforce reductions, the Company at its discretion may choose to augment the separation pay in the above schedule by a 50% premium." *Id.*, ¶2.2(b). The SPP also provided that "to the extent another agreement between the employee and the Company or another plan of the Company provides the employee with a benefit in the nature of separation pay, [the] employee shall receive the greater of the two benefits but not both." *Id.*, ¶2.7.

## 2. Donnelley's offer of enhanced benefits

In February 1993, Donnelley sent letters to all CMD employees stating that because of the "unfortunately sudden, dramatic, and unexpected decision by Sears to end its catalog program," the company was closing the CMD and all employees would be "laid off on March 1, 1993." *See* PX 1 (2/1/93 letter from Bob Revak). The next day, Donnelley sent out two letters – it is not clear which employees received which letters – giving them, respectively, estimates of their "supplemented retirement options" based on "a retirement date of March 1, 1993," and their "Special Augmented Separation Pay (3 times normal separation pay)" based on a separation date of March 1, 1993. PX 3B & 3C.

The first of these letters identified the "supplemented retirement options" as follows:

3

1)      Additional accrued benefits equal to 3 times the prior year's credit benefit (3-year service credit) and 3 years added to actual age for determining early retirement reductions. Benefits will be reduced to adjusted age based on normal early retirement factors (0.3% for months between age 60 and age 65, and 0.4% for months between age 55 and age 59).

2)      No early retirement reduction regardless of age (requires 40 years of service).

3)      Additional benefits equal to estimated age 62 primary social security benefits payable to age 62, with lifetime benefits, but not social security bridge benefits, reduced by .5% per month for each month benefits are received prior to age 62 (requires 25 years service).

4)      Special Augmented Separation Pay equal to three times Regular Separation Pay plus regular retirement benefits reduced for early retirement if less than age 65. Separation pay, under this option, will be determined using adjusted date of hire.

PX 3B. The letter instructed employees to "use the attached Election Form to indicate your choice of supplemented retirement option and return it to your supervisor or manager as soon as possible."

The second letter (concerning "Special Augmented Separation Pay") attached a form entitled "Request to Separate" and said that if the employee wanted to separate prior to March 1, the company would make an effort to accommodate this. Employees were instructed that "[i]f this is your desire, please indicate by completing the attached Request to Separate form ...." PX 3C.

Another group of CMD employees, who were working on non-Sears business, was separated in 1994. They received a letter dated December 6, 1993, which described the "supplemented retirement options available to you in connection with the closing of the division." PX 3F. Those options were essentially identical to those described in the February 2, 1993 letters. The letter advised each employee that his or her supervisor would meet with the

4

employee to discuss the employee's likely retirement date, but that if the employee "wish[ed] to retire as soon as possible," he or she should complete the form attached to the letter and return it. The form was entitled "Request to Retire" and stated, "I request to retire on February 1, 1994, or as soon thereafter as possible."

### 3. Administrative review of plaintiffs' claims

Donnelley treated the employees' elections among the four options in the 1993 and 1994 letters as an either-or choice; employees who opted for enhanced early retirement benefits were given no separation pay (either regular or "special augmented"), and employees who opted for special augmented separation pay received no enhanced early retirement benefits. A number of the plaintiffs challenged these decisions, making claims to the administrators of the Plans (actually Donnelley itself). First, one of the plaintiffs who did not receive the enhanced early retirement benefits appealed, arguing that he and others similarly situated were entitled to those benefits. *See* PX 10C. His argument was that the 1976 version of the Retirement Benefit Plan – the version of the Plan that existed at the time – had been informally amended by Donnelley's practice of providing enhanced benefits in connection with workforce reductions. *See* PX 10D. The Plan administrator denied the claim in April 1994, saying that the company's past practice did not create a substantive right to future benefits. *See* PX 10F, p. 2. This decision was appealed and was denied on review. The reviewing official said that under the Internal Revenue Service regulations upon which the employee relied to support his argument, past practice establishes a right to future benefits only if a reasonable expectation of such benefits has been created. He concluded that because each past enhanced retirement benefit offer had been specifically tied to a particular workforce reduction, those offers did not create a reasonable

5

expectation of future benefits. *See* PX 10I, p. 4.

In a separate claim, certain employees who had received enhanced retirement benefits claimed that they were also entitled to benefits under the Separation Pay Plan. In January 1994, that Plan's administrator denied the claim. *See* PX 11D. The primary basis for the denial was the administrator's conclusion that the employees had chosen to retire and thus were not "separated from the Company because of a reduction in the work force or discontinuation of the employee's job," as required by Section 2.1 of the Plan. *Id.*, p. 3. The administrator also denied the claims of temporary employees for separation pay, relying on section 2.2 of the SPP, which states that "[t]emporary employees shall not be eligible for benefits." *Id.*

The employees appealed the decision pursuant to the Plan's appeal process. *See* PX 11J (decision on review). They argued that they had, in fact, lost their jobs due to a reduction in the work force or a discontinuation of the jobs; that their receipt of retirement benefits or enhanced retirement benefits was immaterial because the SPP did not provide for offset of such benefits; that the "augmented special separation pay plan" was not an amendment to the SPP but was a distinct plan the receipt of benefits under which was not a basis for offset under the SPP; and that employees termed temporary by Donnelley were in fact not temporary based on company practice. *Id.*, pp. 5-6.

The review panel upheld the administrator's decision. It found that at the time of the shutdown, Donnelley presented the employees with enhanced benefits consisting of "[a] package of choices ... from which each terminating employee (including claimants) could and did knowingly select the one best suited to his/her financial situation." It was never Donnelley's intent, the panel found, to allow employees to "benefit doubly" from its decision to grant the

6

employees more benefits than they were entitled to receive under the then-existing plans. *Id.*, pp. 9-10. The panel also found that the claimants who had selected options 1, 2, or 3 from Revak's letter (the enhanced retirement benefits) had "retired" within the meaning of the SPP, whose purpose was to provide separation pay for employees terminated "on account of a reduction in the work force or discontinuation of the employees job *and not by reason of retirement.*" *Id.*, p. 10 (emphasis in original) (quoting SPP, ¶1.1). It therefore concluded that the claimants who had obtained retirement benefits were not entitled to any form of separation pay. *Id.*, p. 11.

The review panel also concluded that employees who had elected special augmented separation pay were not entitled to regular separation pay under the SPP. It found that the SASP document constituted an amendment to the SPP, not a separate plan, and thus did not give rise to benefit rights separate from those in the SPP. It also noted that under paragraph 2.7 of the SPP, receipt of greater benefits in the nature of separation pay under another plan was a bar to receipt of regular separation pay. *Id.* at 11-12. The review panel also upheld the administrator's decision that temporary employees were not entitled to benefits under the SPP. *Id.* at 13.

Finally, employees who had received special augmented separation pay claimed that they were entitled to normal separation pay under the SPP. *See* PX 11I. This claim was denied on the grounds that "it was not the intent of the Company to pay, nor does the Plan provide for the payment of, benefits in the case of a single loss of employment in the total amount of four times the amount of separation pay set forth in Section 2.2(a) of the Plan." *Id.*, pp. 3-4. The Plan administrator also cited section 2.7 of the plan, providing for "non-duplication of benefits." *Id.*, p. 4.

## 4.  The 1994 amendments to the Retirement Benefit Plan

In the latter part of 1994, Donnelley added Supplement Number Two to the Retirement Benefit Plan, retroactive to 1989. The effect of Supplement Number Two was largely to formalize enhanced benefits that had been offered in prior years, including those offered in connection with the CMD shutdown. As pertinent here, it provided that ""[]i]n in the case of early retirement offers Extended to employees who retire during 1993," and either (1) turned 55 by December 31, 1993 and had worked for Donnelley for at least 10 continuous years, or (2) had an age plus years of service total of 75 or more (the "Rule of 75") were entitled to early retirement benefits at a lower reduction from standard benefit rates than under the original SBP. *See* PX 13, Supp. Two, ¶5(a)-(b). Additionally, Supplement Two permitted eligible employees to

choose one of the following three types of enhanced early retirement pensions:

(i) an increase in their credited service by three years based on compensation for each of such years equal to their [1991, for 1992 retirees, or 1992, for 1993 retirees] compensation plus an increase in age by three years;

(ii) unreduced benefits regardless of age, but only if the Employee has completed at least 40 years of service at his retirement date; or

(iii) an increased benefit equal to the Employee's estimated Primary Social Security Benefit commencing at age 62 payable until the Employee attains age 62, but only if the Employee has completed at least 25 years of service at this retirement date.

*Id.*, ¶5(c). Supplement Two also provided that "[i]n the case of early retirement offers extended to Employees who retire during 1994," the early retirement reduction under the Plan would not apply, and such employees could choose

8

one of the following two types of enhanced early retirement pensions:

> (i)  an increase in their credited service by four years based on compensation for each of such years equal to their 1993 compensation; or

> (ii)  an increased benefit equal to the Employee's estimated Primary Social Security Benefit commencing at age 62 payable until the employee attains age 62, but only if the Employee has completed at least 25 years of service at this retirement date.

*Id.*, ¶¶6(a)-(c).

As we will discuss below, Donnelley did not provide employees with a copy or a summary description of Supplement Two when it was adopted in December 1994, or at any time before this lawsuit was brought. Plaintiffs first received a copy of Supplement Two, it appears, in or about December 1997, via discovery in this lawsuit.

**5.  Plaintiffs' current claims**

Plaintiffs' motion for summary judgment identifies, as best as we can tell, seven claims under the umbrella of Counts 1 and 2, some of which overlap with each other. Plaintiffs argue that under the 1989 RBP, as it was amended in 1994 retroactive to 1989: 1) CMD employees terminated in 1993 who met the "Rule of 75" are entitled to enhanced retirement benefits; 2) employees from "surplus occupations" terminated in 1994 are entitled to enhanced retirement benefits; and 3) employees who received benefits under the SPP are entitled to enhanced retirement benefits under the RBP as well. Plaintiffs also contend that: 4) all CMD employees terminated in the shutdown are entitled to benefits under the SPP; 5) employees who selected enhanced retirement benefits are entitled to benefits under the SPP; and 6) temporary employees are entitled to SPP benefits. Finally, plaintiffs argue that: 7) employees terminated in 1993 who were age 54 should be allowed to "bridge" to age 55, thus entitling them to benefits under the

RBP.

Count 1 includes plaintiffs' claims for benefits under the RBP (items 1, 2, and 3 above). Donnelley argues that plaintiffs should not be permitted to pursue these claims in their current form, as they were not included in plaintiffs' complaint, which was filed in late 1995 and never amended. The primary thrust of Count 1 as alleged in the complaint is the contention made in the administrative appeal described earlier: that through various actions over the years, Donnelley had established a pattern and practice of offering enhanced early retirement benefits every time it had a reduction in force and it had thereby established a *de facto* retirement plan, entitling the plaintiff class members to enhanced retirement benefits. It is difficult to construe this claim as including the claims currently forwarded by plaintiffs, which are based on the terms of the formally-adopted Plan.[1]  However, as plaintiffs point out, the Rules of Civil Procedure permit complaints to be amended relatively freely, even after trial in some situations. *See* Fed. R. Civ. P. 15(a) & (b). Moreover, there is a good reason why plaintiffs did not base their original complaint on the terms of the Plan itself: when Donnelley amended the Plan in late 1994 to formally include the provisions on which plaintiffs now rely, it did not provide employees with copies of the plan, and indeed did not produce it in this litigation until December 1997. Though the Court is somewhat mystified as to why plaintiffs did not amend their complaint at that point, they did make it abundantly clear in their motion for summary judgment that they were relying on the Retirement Benefit Plan itself (as amended in 1994 retroactive to 1989), and not on their former theory of liability. Defendants have never suggested that they need further discovery to

---

[1]  Indeed, plaintiffs have abandoned the claim of *de facto* amendment described in their complaint, and the Court will not hereafter permit them to revive it.

be able to respond; instead they responded to the motion, albeit largely by arguing that plaintiffs should not be allowed to assert a new claim and that they had not exhausted Plan remedies concerning the new claim (a point we discuss below). Under the circumstances – particularly defendants' unexplained non-production of the Plan until three years after its adoption – the Court sees no basis to deny plaintiffs the right to pursue the theories they now advance.

### 6. Standard of review

Although, as will be seen shortly, the Court intends to require plaintiffs to exhaust Plan remedies with regard to their reconstituted Count 1 RBP claims, the standard under which we review the Plan administrators' determinations arguably has a bearing on the exhaustion issue, so we will address it at the outset. As it turns out, the standard of review applying to claims under the RBP differs from that applying to claims under the SPP.

### a. Separation Pay Plan

A denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). The Seventh Circuit has recently attempted to clarify when such "discretionary authority" exists. In *Herzberger v. Standard Insurance Co.,* 205 F.3d 327 (7th Cir. 2000), the Court noted that *Bruch* "makes plenary review the default rule, that is, the rule to govern when the plan documents contain no indication of the scope of judicial review." *Id.* at 330. "Uncertain language concerning the scope of judicial review," the court said, "favor[s] plenary review as well." *Id.* The court said that "the conferral of discretion is not to be assumed"; "[t]he employees are entitled to know what they're getting into, and so if the employer is going to reserve a broad,

unchanneled discretion to deny claims, the employees should be told this, and told clearly." *Id.* at 331, 333.

In *Herzberger,* the court held that the fact that the plan gave the administrator authority to determine eligibility or entitlement and required satisfactory proof before a claim could be approved "does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary." *Id.* at 330. In this case, the Separation Pay Plan provided that the administrator had "the authority to construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of benefits." PX 16, ¶3.1. The SPP also provided that "[t]he Plan Administrator's decisions made pursuant to this Section are intended to be final and binding on participants, beneficiaries and others." *Id.,* ¶3.2(f). Plaintiffs argue that this language does nothing more than advise the reader that the administrator has the authority to decide whether and when a claimant is entitled to benefits; relying on *Herzberger,* they argue that it does not confer discretion sufficient to take this plan out of the "default" plenary form of review. The Court does not agree. The SPP, unlike the plan considered in *Herzberger,* does not simply give the administrator the authority to determine claims; it goes on to say that those determinations are "final and binding." This case is virtually indistinguishable from *Exbom v. Central States Health and Welfare Fund,* 900 F.2d 1138 (7th Cir. 1990), which we believe survives *Herzberger.* In that case, like this one, the plan said that the trustees had the power to construe the plan's terms and that their construction of the plan and determination of any controversies would be "binding." The court held that this language conferred discretion sufficient to require a court to review the trustees' decisions under the "arbitrary and capricious" standard. *Id.* at 1141. The plan language

used in *Exbom* and here clearly advises participants that the plan administrator's decision is the final word. This is sufficient under *Herzberger* to limit the Court's review of the administrator's decisions under the SPP to a determination of whether the decisions were arbitrary and capricious.

### b. Retirement Benefit Plan

The same is not true of the Retirement Benefit Plan. That plan states that the administrator "shall have the duty and authority to interpret and construe the Plan in regard to all questions of eligibility, the status and rights of Members, Beneficiaries and other persons under the Plan, and the manner, time, and amount of payment of any distributions under the Plan. ... All determinations and decisions of the Administrative Trustees shall be made and applied to all Members in similar circumstances in a uniform, nondiscriminatory manner." PX 13, ¶10.1(d). Unlike the SPP, the RBP contains no "final and binding"-type language. This, we think, is sufficient to distinguish the RBP from the plan in *Exbom*. As was the case in *Herzberger,* the RBP simply gives the administrator the authority to make decisions regarding who gets benefits and when. It does not suggest that those determinations are in any way insulated from review (indeed, the final sentence quoted above suggests exactly the opposite), and it does not confer discretion sufficient to take claims out of the "default" plenary form of review. Claims under the RBP are therefore subject to *de novo* review.

### 7. Count 1 (RBP claims) - exhaustion of Plan remedies

Donnelley argues that plaintiffs' revised version of Count 1 is deficient because plaintiffs did not exhaust Plan remedies regarding that claim. Certainly there is no basis to contend that plaintiffs were required to exhaust their current claims before filing suit; they could not be

expected to have asserted a claim that they had no way of knowing existed – indeed a claim that they fairly contend defendants concealed from them. The law requires that employers advise their employees in writing within a specified period after any material modification to an ERISA-governed plan, *see* 29 U.S.C. §1024(b)(1), and from what we have been told it is beyond question that Donnelley failed to comply with this obligation after it adopted the 1994-retroactive-to-1989 amendments.

The Court might be justified in excusing exhaustion on this basis. As plaintiffs note, ERISA is silent on the issue of exhaustion, and the Seventh Circuit has said that district courts have "discretion" to require exhaustion. *See, e.g., Gallegos v. Mt. Sinai Medical Center,* 210 F.3d 803, 807-08 (7th Cir. 2000). But that does not mean that a court can lightly excuse a claimant from pursuing his claims before the plan administrator. The Seventh Circuit has made it clear that requiring exhaustion furthers important goals, including among other things "compilation of a complete record in preparation for judicial review," *id.* at 808, and providing the court with the plan administrator's interpretation of relevant plan terms. *See Lindemann v. Mobil Oil Corp.,* 79 F.3d 647, 650 (7th Cir. 1996). Requiring exhaustion may, in some instances, render judicial intervention unnecessary. *Id.*

There are circumstances in which exhaustion is properly excused: when administrative remedies are unavailable, and where exhaustion would be futile. *See, e.g., Gallegos,* 210 F.3d at 808. The Court is not persuaded that either is the case here. By insisting on exhaustion, Donnelley is effectively telling the Court that it will not contend that an administrative claim or appeal would be untimely (were the opposite true, the Court would reach a different conclusion on exhaustion). Nor can we say with any certainty that exhaustion would be futile; as far as we

14

can tell, no Plan beneficiary has ever presented claims of this type to the Plan administrator. One might argue that since we have determined that the decisions of the RBP administrator are reviewed *de novo,* exhaustion will be a waste of time. The Court does not think so. Irrespective of which way the administrator's decision goes, having the benefit of his views, as well development of a factual record, will assist the Court even though we will be deciding the matter *de novo.*

*Wilczynsky v. Lumbermen's Mutual Casualty Co.,* 93 F.3d 397, 402 (7th Cir. 1996), says that a plaintiff's failure to exhaust may be excused "where there has been a lack of meaningful access to the review procedures." It might be argued that that is the case here, due to Donnelley's delay in producing the 1994 amendments to plaintiffs. But we will not excuse exhaustion in this case, for two reasons particular to this case beyond those set forth above. First, though we have permitted plaintiffs, in effect, to amend their complaint to include claims based on the 1994 Plan amendments, there is no good reason why they could not have sought to present their claim to the Plan administrator once they received the 1994 amendments nearly three years ago. Second, there is significant overlap between the RBP claims of the plaintiffs in this case and those forwarded by the plaintiffs in the case of *Jefferson v. R.R. Donnelley & Sons Co.,* No. 00 C 8069, a case filed in December 2000 in which the plaintiffs have no legitimate excuse for failing to exhaust Plan remedies. The Court intends to enter an order in *Jefferson* that will require exhaustion in that case. Because the Plan administrator will shortly be required to deal with those overlapping issues in that closely related case (brought by the same attorneys who represent the plaintiffs here), there is no good reason to avoid exhaustion in this case.

One final point. Because of the unusual procedural posture of the case due to

Donnelley's delay in producing the 1994 Plan amendments, rather than dismissing Count 1 without prejudice, the Court will stay further proceedings on that claim pending exhaustion. Under the circumstances, we will insist that this be accomplished promptly, and accordingly proceedings will be stayed for 120 days, and 120 days only. We expect both sides to cooperate in ensuring that the administrative review process be completed within that time. In the event either side wishes to pursue the matter further in Court following that review, it may renew its summary judgment motion as to Count 1 at that time.

8.    **Count 2 - claims under SPP**

Plaintiffs contend that all CMD employees terminated in the shutdown were entitled to benefits under the Separation Pay Plan, regardless of whether they selected enhanced early retirement benefits under the Revak letter. They also argue that so-called "temporary" employees were entitled to SPP benefits. The SPP Plan administrator denied both claims. As indicated earlier, we review that denial to determine whether it was arbitrary and capricious. Such review, though deferential, is not completely toothless: "if fiduciaries or administrators or an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious." *Swaback v. American Information Technologies Corp.,* 103 F.3d 535, 540 (7th Cir. 1996).

We begin with the claims for SPP benefits by permanent employees who had selected enhanced retirement benefits under the Revak letter (options 1 through 3 of that letter). The SPP administrator said that the employees had "retired," which precluded any claim under the SPP, and that the Revak letter had given them an either-or choice. The Court is convinced that both determinations were arbitrary and capricious. Initially we note that the SPP precludes payment of separation pay only if another agreement provides "a benefit in the nature of separation pay";

16

this provision would not necessarily eliminate the possibility that an employee could collect both retirement benefits and separation pay, and we therefore look deeper into the Plan documents. The SPP's "purpose" provision does appear to distinguish between employees who "retire" from the company and employees who leave the company because of a workforce reduction or a discontinuation of their job:

> It is the intention of R.R. Donnelley & Sons Company (the "Company") to provide separation pay for certain eligible employees whose termination of employment has been initiated by the Company on account of a reduction in the workforce or discontinuation of the employee's job *and not by reason of a transfer to an affiliated or successor employer or retirement*. Payments are intended to assist in bridging periods of unemployment following termination. SPP, ¶1.1 (emphasis added).

That distinction does not specifically appear in the "eligibility" provision, which says: "[o]nly a permanent employee of the Company who is separated from the Company because of a reduction in the work force or discontinuation of the employee's job shall be eligible for benefits as described in this Plan." *Id.*, ¶2.1. That does not necessarily mean that the two provisions conflict. But the purported distinction between retirement and other forms of separation does not appear in the Summary Plan Description of the SPP, likely the only document actually given to Donnelley employees. The Summary Plan Description first notes that "[f]or many years it has been the Company's practice to provide separation pay to eligible employees separated because of a reduction in workforce or discontinuation of their jobs. This plan formalizes, but does not generally change the terms of, this separation pay practice." PX 34, p. 1. Regarding eligibility, the Summary Plan Description states that "[o]nly permanent employees ... who are separated from the Company because of a reduction in the workforce or discontinuation of employees' jobs are eligible for benefits under this Plan." *Id.*

17

Donnelley argues that this language shows that the company did not intend to pay separation benefits to employees who "retired" and that the company did not intend to pay both retirement and separation pay benefits to the same employee. But what happened here was not an ordinary "retirement" – it was, indisputably, a forced retirement occasioned by a reduction in the CMD work force and discontinuation of the employees' jobs. Under the plain terms of the Summary Plan Description as well as the Plan itself, such employees were eligible for separation pay, whether or not they were deemed by Donnelley to have "retired." To the extent the single phrase in the SPP's purpose provision relating to retirement can be read to render the plaintiffs ineligible for separation pay benefits, the Plan language would directly conflict with the Summary Plan Description, which says nothing about retiring employees being ineligible for benefits. In that case, because the plaintiffs claim that they relied on the Summary Plan Description's language, that language would control. *See Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir. 1999) (If the plan and the summary plan description conflict and if the plan participant has reasonably relied on the summary plan description to his detriment, then the summary plan description governs). In reaching a contrary conclusion, the Plan administrator effectively added a qualification for benefits that was not included in the Summary Plan Description or the Plan itself. Deviating from the language of a plan, and imposing requirements that a plan does not include, is by definition arbitrary and capricious. *Swaback,* 103 F.3d at 541.

The plan administrator also relied on the proposition that the Revak letters gave employees an either-or choice, so that selection of enhanced retirement benefits precluded receipt of benefits under the SPP. Though that conceivably might be what Donnelley wanted to

accomplish, it plainly did not attain that result by way of the Revak letters, which discussed only the *enhanced* benefits being made available and included nothing suggesting the employee's resulting ineligibility under the *existing* SPP. In *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420 (4th Cir. 2000), a case on which Donnelley relies, the defendant company decided because of economic concerns to reduce its workforce, and in connection with that lay off sent election forms requiring employees to select one of two options: option one involved enhanced pension benefits, while option two involved regular pension benefits plus severance pay. *Id.* at 424. But unlike Donnelley's letter, the letter sent in *Stokes* specifically advised the employee that by selecting one option, he or she was expressly giving up the other option. *Id.* Thus, by signing the form, the employees indicated, not only that they were aware of the trade off, but that they agreed to it. The plaintiffs in this case would have had no reason to think that by picking a retirement option, they were necessarily giving up their right to separation pay under the SPP. *See also id.* at 427 (pension benefits and severance pay serve different purposes and are therefore not fungible) (citing the legislative history of the Older Workers Benefits Protection Act). Accordingly, the administrator's reliance on the Revak letter was arbitrary and capricious. *See James v. General Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) (a plan administrator's decision is arbitrary and capricious if it was "the wrong call" and was "downright unreasonable," if it was based upon an unreasonable interpretation of the plan documents) (citations omitted).

The Court reaches a different conclusion regarding the claims of the so-called temporary employees. The SPP provided in unambiguous terms that "[t]emporary employees shall not be eligible for benefits." PX 16, ¶2.1. None of the evidence or arguments that plaintiffs provided to the administrator, and none of the evidence or arguments that they make here, in any way suggest

that Donnelley did anything that had the effect of converting otherwise temporary employees to permanent status. In particular, we agree with Donnelley that the company's creation of the concept of "adjusted hire dates" had nothing to do with whether an employee was permanent or temporary.

Finally, though it is not entirely clear that plaintiffs are still advancing a claim to SPP benefits for on the employees who selected option 4 of the Revak letter (which consisted of both a "special augmented separation pay" component and a "regular retirement benefits" component), we uphold the plan administrator's determination that these employees were not entitled to regular separation pay under the SPP. Paragraph 2.7 of the SPP, entitled "nonduplication of benefits," precluded employees who accepted special augmented separation pay, which was clearly "a benefit in the nature of separation pay," from collecting regular separation pay as well.

### 9. Plaintiffs' "bridging" claim

Plaintiffs argue that employees who separated in 1993 and had not yet turned 55, but who turned 55 the year after they separated, should have been allowed to "bridge" that time by taking a leave of absence or other administrative leave until such time as they turned 55 and thereby became eligible for enhanced retirement benefits under the RBP. Donnelley argues that the Court should enter judgment in its favor on this claim because the plaintiffs raised it for the first time in their motion for partial summary judgment. Not so. In their complaint, the plaintiffs alleged that

> [e]mployees under the age of 55 were offered the opportunity to use leave of absences and other unwritten guidelines in an effort to help them attain a "rule of 75" which then enhanced their benefits but employees over the age of 55 were

20

offered no such opportunities to enhance their benefits. Furthermore, some employees who were close to age 55 were allowed the opportunity to attain age 55 status for pension purposes while others were not.

Complaint, ¶19. In answer to this allegation, Donnelley admitted that it allowed "bridging" for employees who turned 55 during the calendar year they were separated, but denied that any bridging was ever permitted beyond year-end for purposes of attaining age 55. Answer, ¶19.[2]

In support of their summary judgment motion on this point, the plaintiffs submitted a December 8, 1993 interoffice memorandum from Glenn Ikeda. The memo states as follows:

> a surplus employee who would normally be separated during the 1993 Workforce Reduction Program (that began November 1, 1993 and ends on March 31, 1994) may be placed on Leave of Absence, for a short period of time, if one of the following conditions is met.
>
> — The employee is age 54 and attains age 55 by October 31, 1994, and in doing so, qualifies for retiree medical.
>
> — Or, the employee is already age 55 but has less than 10 years of continuous service and will attain 10 years continuous service by October 31, 1994, and in doing so, qualifies for retiree medical.
>
> If one of the above conditions is met, the employee may be placed on unpaid Leave of Absence (LOA) until age 55 or ten years continuous service is attained. Separation must occur immediately after reaching the qualifying event. . . . Employees attaining age 55 by October 31, 1994 may be offered the supplemented retirement options or special augmented separation pay as long as the offer has been made by November 30, 1993 and the employee has the ability to separate or go on leave of absence by December 31, 1993.

PX 42. The plaintiffs allege that "four of the Plaintiffs and class members in this case separated prior to December 31st 1993 and turned age 55 prior to October 1, 1994 but were not allowed a leave of absence into 1994." Plaintiffs' Memorandum in Support of Motion for Partial Summary

---

[2]Donnelley has not argued that plaintiffs failed to exhaust Plan remedies regarding this claim.

Judgment, p. 26. Under the policy outlined in the Ikeda memo, these employees should have been offered the enhanced early retirement benefits, and Donnelley has offered nothing to explain why they were not; nor has it offered anything to refute the plaintiffs' allegations on this claim. Accordingly, the Court finds that the plaintiffs are entitled to summary judgment on their bridging claim: the four plaintiffs and class members who satisfy the criteria spelled out in Ikeda's memo are entitled to enhanced retirement benefits under the RBP.[3]

## B. Count 3: class age discrimination claim (targeting older employees for termination)

In Count 3 the plaintiffs allege that Donnelley disproportionately targeted older employees for termination in connection with its various workforce reductions. Donnelley has moved for summary judgment on this count; the plaintiffs have not. In its motion, Donnelley assumes that the plaintiffs have alleged a "pattern and practice" claim under the ADEA, which, they argue, must be supported by both statistical and anecdotal evidence. *See* Defendants' Memorandum in Support of their Motion for Summary Judgment, pp. 13-14. Proceeding on that assumption, Donnelley argues that it is entitled to summary judgment on this claim because the plaintiffs' statistical evidence is flawed and useless and because their anecdotal evidence fails to show that discrimination was routine at the CMD. In response to the motion, the plaintiffs argue that they have alleged "pattern and practice," "disparate treatment," and "disparate impact" claims. The Seventh Circuit has held that disparate impact claims are not actionable under the ADEA. *See Erickson v. Board of Governors of State Colleges & Universities for Northeastern*

---

[3]To the extent plaintiffs were claiming that they should have been allowed to bridge time beyond October 31, 1994 or that they should have been entitled to bridge time to satisfy Rule of 75 requirements, the Court finds that those claims have been abandoned. In other words, the discussion in this opinion disposes of the entirety of plaintiffs' bridging claim.

*Illinois University*, 207 F.3d 945, 949 (7th Cir. 2000) ("the ADEA forbids disparate treatment

but not disparate impact"); *Salvato v. Illinois Department of Human Rights*, 155 F.3d 922, 926

(7th Cir. 1998) ("In this circuit, at least, the ADEA does not permit liability based solely on

disparate impact."). Because plaintiffs cannot maintain a disparate impact claim, we consider

Donnelley's motion with respect to the pattern and practice and disparate treatment claims only.

To win on their pattern and practice claim, the plaintiffs must show "by a preponderance

of the evidence that [age] discrimination was the company's standard operating procedure – the

regular rather than the unusual practice." *International Brotherhood of Teamsters v. United

States*, 431 U.S. 324, 336 (1977), *quoted in Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 422

(7th Cir. 2001). To win on their disparate treatment claims, they must show that Donnelley

carried out the workforce reduction program, including its transfer program and its job

clearinghouse, in a discriminatory way. *Adams*, 231 F.3d at 422 (citing *Bellaver v. Quanex

Corp.*, 200 F.3d 485, 494 (7th Cir. 2000)). Here, the plaintiffs have offered both statistical

evidence (in the form of initial and rebuttal reports prepared by Christopher Ross, Ph.D.) and

other circumstantial evidence to support their claims, and wisely so: "statistical evidence can be

very useful to prove discrimination in either or both of those two kinds of cases [disparate

treatment and pattern and practice cases], but it will likely not be sufficient by itself." *Adams*,

231 F.3d at 423. Ross, who is a sociologist, constructed databases (using data obtained from

Donnelley for the most part) on approximately 10,000 company-wide hires in 1993 and 1994.

Using that data, he asked and answered various questions about terminations and transfers at the

CMD. Ross concluded that Donnelley's process for transferring CMD employees "favored

younger workers" and that the "disparity between the proportion of the workforce and the

proportion of transfers was found to be associated with age ...." PX 52, p.8. Ross concluded that

"[p]ermanent employees over forty were retained (transferred) at a much lower rate (74.4%) than

they represent in the workforce (88.0%) . . . [which] reveals that the mechanism for selecting

permanent employees to be retained beyond February 1993 was biased in favor of the selection

of employees under forty years of age." *Id.*, p. 2. He reached the same conclusion with respect

to employees under fifty years of age, and employees under the age of fifty-five. *Id.*, pp. 2-3.

Donnelley argues that we should reject Ross' statistics and his conclusions for several

reasons, including the following: (1) Ross compared all CMD employees with those who

transferred, whereas he should have compared the group of employees who requested transfers

with the group of employees who received transfers; (2) Ross included temporary employees in

some of his analyses; (3) Ross did not include employees who were offered, but declined, a

transfer; and (4) Ross compared positions filled nationwide in 1993 and 1994 with positions

filled through the clearinghouse Donnelley set up to help CMD employees find other jobs within

the company during that same time period, but the clearinghouse was not open for that entire

time. *See* Defendants' Memorandum in Support of their Motion for Summary Judgment, pp. 15-

19.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993), expert

testimony, including statistical evidence such as that presented in Ross' reports, is admissible

only if two requirements are met: first, the proffering expert must have "genuine expertise" or

"scientific knowledge," and, second, that expertise must assist the trier of fact to understand or

determine a fact in issue; in other words, to be admissible, the expert testimony must be both

reliable and relevant. *See Daubert*, 509 U.S. at 592; *Adams*, 231 F.3d at 423 (citing *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Based on the parties' submissions, the Court is

not persuaded that Ross' reports are either unreliable or irrelevant; certainly, we cannot say that

the "flaws" Donnelley points out would necessarily render Ross' testimony inadmissible under

*Daubert*.  Donnelley has basically challenged the factors that Ross either wrongly considered or

wrongly failed to consider in analyzing the data.  But "failure to include variables will affect the

analysis' probativeness, not its admissibility." *Adams*, 231 F.3d at 423 (quoting *Bazemore v.*

*Friday*, 478 U.S. 385, 400 (1986)).  It will be up to the trier of fact to assess, in light of the flaws

Donnelley has pointed out, what significance to place on Ross' statistics.  *See Kadas v. MCI*

*Systemhouse Corp.*, 255 F.3d 359, 362-63 (7th Cir. 2001) (the question of whether statistical

evidence is admissible is different from the weight to be accorded to the significance of a

particular correlation found by that evidence).

Moreover, we need not decide whether Ross' reports would be enough, on their own, to

convince a jury that Donnelley discriminated on a routine basis and that it discriminated against

the plaintiffs.  We consider the statistical evidence Ross offered in combination with the other

evidence submitted by the plaintiffs.  In particular, the "Mayer memo," which stated that rehires

will be retained to "facilitate our placing younger employees in other divisions," combined with

Ross' evidence, is enough to get the plaintiffs to a jury on this claim.  Although Mayer did not

have final say in terms of who was "retired," who was transferred and who was retained, in

*Adams*, a similar comment by a person in what appears to be a similar position factored heavily

in favor of the Court's ruling that the case should go to a jury.  *See Adams*, 231 F.3d at 421, 429

(a statement by the coordinator of the reorganization selection process that the company wanted

to "start bringing in some folks that are under 45 years old" was enough to show that the

company's downsizing program may not have been age neutral in design or implementation). Although a jury is free to accept Donnelley's benign explanation of Mayer's memo, it could just as easily believe the plaintiffs' view of the language. As an aside, Donnelley argues that Mayer's age (57) and the ages of those who received his memo (all but one was in the protected age group) undermine the plaintiffs' discrimination claim. But the Seventh Circuit has said otherwise. *See Kadas.*, 255 F.3d at 361 ("the relative ages of the terminating and terminated employee are relatively unimportant").

In sum, the plaintiffs have offered evidence from which a jury reasonably could conclude that Donnelley designed and implemented its workforce reduction programs, including the jobs clearinghouse, to work to the disadvantage of employees who were over the age of forty and that it selected employees for termination and transfer on the basis of age. Accordingly, the Court denies Donnelley's motion for summary judgment on Count 3.

## C.    Count 4:  class age discrimination claim (failure to pay separation pay benefits)

In Count 4 the plaintiffs allege that Donnelley violated the ADEA by denying separation pay benefits to employees aged 55 and over, while paying separation pay benefits to employees under the age of 55. But the record shows that Donnelley offered the older employees a choice of options, one of which consisted in part of an augmented separation pay component, whereas the younger employees (many of whom were still within the protected age range) were not offered that choice. Thus, as Donnelley points out, the older employees were actually treated better than the younger employees. Donnelley is therefore entitled to summary judgment on this claim. *See Stokes*, 206 F.3d at 426-28.

### D.  Count 5:  Nedved's Breach of Fiduciary Duty Claim

George Nedved worked as a pressman for Donnelley at the CMD.  In June 1992, Nedved, who by then had been with the company for thirty-six years, asked his foreman, Eric Bornquist, his department superintendent, William Hirschberger, and finally the CMD director, Robert Revak, whether the company had any planned reductions in the pressroom workforce that would lead to an offer of early retirement incentives.  All three men told Nedved that the company had nothing planned:  Bornquist told Nedved that there would not be any "packages" in the "immediate future," DX 48, p. 18; Hirschberger told him there were no packages "on the immediate horizon," *id.*, p. 21; and Revak told him, more adamantly than the others, that there definitely would not be any incentives offered, *id.*, p. 26.  At the time of those conversations, Nedved had no reason to doubt the veracity of Bornquist's, Hirschberger's or Revak's statements, *id.*, pp. 27-29, and so on July 1, 1992, at the age of 55, Nedved retired, receiving only regular early retirement benefits.  About two months later, after Sears announced its plans to discontinue the catalog work, Donnelley started to consider a workforce reduction at the CMD.  On December 11, 1992 Revak requested corporate approval for a reduction plan to offer incentives to employees retiring from departments, including Nedved's old department, during the period from January 1993 through March 1993.

In January 1993, Nedved wrote to Donnelley's Chairman complaining that the company had lied to him about the availability of enhanced retirement benefits, and on October 12, 1993 he filed a formal claim for such benefits.  Donnelley rejected the claim, Nedved appealed, and the plan administrator affirmed the denial of benefits.  Nedved then sued, alleging that Donnelley breached its fiduciary duty to him by not telling him about the upcoming workforce

reductions at the CMD; he has since also alleged that Donnelley breached its fiduciary duty by not telling him that he would have been entitled to enhanced benefits if his position was formally declared "surplus."

As the Court has previously concluded, we review *de novo* claims for denial of benefits under the RBP. After reviewing the parties' submissions, however, we reach the same conclusion as the administrator. The record shows that at times, Donnelley would offer enhanced pension benefits to induce employees to retire early. And indeed Supplement Two, which codified this practice, made employees eligible for enhanced early retirement pensions if they were "determined by the officers of the Company to be in surplus occupations" or if their retirement "would otherwise be beneficial to the Company." Supplement Two, ¶4(a). But Nedved concedes that when he retired, the company was not offering enhanced benefits and his job had not been declared surplus. These facts alone support the decision to deny Nedved enhanced retirement benefits.

Nedved alleges that Donnelley knew that in the near future it was going to have another reduction in force and would offer the enhanced early retirement benefits that always went along with such a reduction, but that it told him this was not going to happen, causing Nedved to retire before the enhanced benefits kicked in. But "ERISA does not impose a duty of clairvoyance on fiduciaries. An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan." *Fischer v. Philadelphia Electric Co.*, 96 F.3d 1533, 1539 (3rd Cir. 1996) (citing cases emphasizing the absence of a "duty of clairvoyance"). There is simply no evidence in the record to suggest that in June 1992, when Nedved asked about the availability of enhanced early retirement benefits, Donnelley knew the CMD shutdown (or any other RIF) was coming

down the pike; nor is there any evidence to suggest that Donnelley knew Nedved's position was going to be declared surplus at any point in the future. In fact, the record shows that the company did not begin to consider a workforce reduction in Nedved's department until at least three months after Nedved asked whether any incentives would be offered and until at least two months after he actually retired. And the company did not start declaring pressman positions to be surplus occupations until November 1992.

At his deposition, Nedved implied that he thought he might be entitled to enhanced benefits because he "was not being used regularly as a pressman, that were was a slight reduction in demand for employees." PX 44, p. 29. But Nedved explained that he had been required, because of work shortages within his assigned area, to fill in on other assignments throughout his entire career at Donnelley. *Id.*, pp. 31-32. So this fact, standing alone, is simply not enough to suggest that Bornquist, Hirschberger and Revak had any notion that the company might open another early retirement window or declare pressman positions surplus at any point in the foreseeable future.

Nor did the company do anything to lead Nedved to believe that he would have been entitled to benefits if he retired outside of one of the windows or from a position that had not formally been declared surplus. It is true that Donnelley offered enhanced benefits to one employee, LaVerne Lewis, who technically did not retire within a package window. Lewis apparently wanted to retire during the window to take advantage of the enhanced benefits package, but because of back surgery she was on disability until a month after the window expired; given the circumstances, the company extended the window for her and only for her. That one case would not have been enough to give Nedved a reasonable expectation that he

29

would be entitled to enhanced benefits. And indeed it is clear from his behavior – asking his superiors whether he should expect a window to open any time soon -- that Nedved knew he would receive enhanced retirement benefits only if he retired during an open window period. Accordingly, Donnelley is entitled to summary judgment on Nedved's breach of fiduciary duty claim.

## CONCLUSION

For the reasons explained above, proceedings on Count 1 are stayed through February 28, 2002 to permit plaintiffs to exhaust Plan remedies regarding their reconstituted claims asserted in that Count. The Court grants Donnelley's motion for summary judgment [Docket #149-1] as to Counts 4, 5, and that part of Count 2 relating to the claims for separation pay benefits by plaintiffs who elected supplemented retirement option 4, but denies the motion in all other respects. The Court grants plaintiffs' motion for partial summary judgment [Docket #153-1] as to that part of Count 2 relating to the claims for separation pay benefits by plaintiffs who elected supplemented retirement option 1, 2 or 3, and as to plaintiffs' bridging claim, but denies the motion in all other respects. The case is set for a status hearing on November 8, 2001 at 9:30 a.m. for the purpose of setting a trial date with regard to the Count 3 claims. All trial counsel are directed to appear and to be prepared to discuss the anticipated length of trial.

Dated: October 26, 2001

MATTHEW F. KENNELLY
United States District Judge